# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

SUZANNE CERRO,             :

                     :

        Plaintiff,          :

                     :

        v.              :      C.A. No. 12-761-LPS

                     :

CAROLYN COLVIN,       :

Acting Commissioner     :

of Social Security,       :

                     :

        Defendant.     :

---

Stephen A. Hampton, GRADY & HAMPTON, LLC, Dover, DE

    Attorney for Plaintiff.


Charles M. Oberly, III, United States Attorney, and Dina W. Griffin, Special Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Wilmington, DE.

Eric P. Kressman, Regional Chief Counsel, and Allyson Jozwik, Assistant Regional Counsel, SOCIAL SECURITY ADMINISTRATION-REGION III OFFICE OF GENERAL COUNSEL, Philadelphia, PA.

    Attorneys for Defendant.

---

## MEMORANDUM OPINION

September 30, 2014
Wilmington, Delaware

**STARK, U.S. District Judge:**

## I.    INTRODUCTION

Plaintiff Suzanne Cerro ("Cerro" or "Plaintiff") appeals from a decision of Carolyn Covin, the Acting Commissioner of the Social Security Administration ("Commissioner" or "Defendant"), denying her claim for supplemental security income ("SSI") under Title XVI of the Social Security Act. The Court has jurisdiction pursuant to 42 U.S.C. § 405(g).

Presently pending before the Court are cross-motions for summary judgment filed by Plaintiff and Defendant. (D.I. 19, 22) Plaintiff seeks partial reversal of Defendant's decision and an award of benefits back through 2006, or, in the alternative, remand for another hearing. (D.I. 20 at 21) Defendant requests that the Court affirm her decision. (D.I. 23 at 14) For the reasons set forth below, the Court will deny Plaintiff's motion for summary judgment and grant Defendant's motion.

## II.    BACKGROUND

### A.    Procedural History

Plaintiff filed her claim for SSI on October 24, 2003, alleging disability since September 29, 2003. (D.I. 11 (hereinafter "Tr.") at 18) Her application was denied at the pre-hearing levels. (*Id.*) She appeared before an Administrative Law Judge ("ALJ") on March 8, 2005; on April 28, 2005, the ALJ issued a decision unfavorable to Plaintiff. (*Id.* at 73-80, 267) The Appeals Council granted Plaintiff's request for review and remanded the case to the ALJ on September 21, 2006. (*Id.* at 140-43) The ALJ conducted a remand hearing on May 1, 2007 and, on November 20, 2007, issued a partially favorable decision. (*Id.* at 87-105) The Appeals Council was unable to take action on Plaintiff's request for review of this decision because the written

record and accompanying materials could not be found. (*Id.* at 107-08) Accordingly, the Appeals Council remanded the case for another hearing and reconstruction of the missing file. (*Id.* at 108) The subsequent hearing was conducted by a different ALJ on February 23, 2010. (*Id.* at 18) On March 23, 2010, this ALJ issued a decision upholding the prior determination that Plaintiff was disabled beginning on February 2, 2006, but not disabled between her protective filing date of October 1, 2003 and her 50th birthday on February 2, 2006. (*Id.* at 18-34) Plaintiff's request for review by the Appeals Council was denied on April 19, 2012. Thus, the March 23, 2010 decision by the ALJ became the final decision of the Commissioner. *See* 20 CFR §§ 404.955, 404.981; *Sims v. Apfel*, 530 U.S. 103, 107 (2000).

On June 18, 2012, Plaintiff filed a complaint seeking judicial review of the ALJ's March 23, 2010 decision. (D.I. 1) Subsequently, on March 7, 2013, Plaintiff moved for summary judgment. (D.I. 19) On April 15, 2013, the Commissioner filed a cross-motion for summary judgment. (D.I. 22)

**B.     Factual Background**

**1.     Plaintiff's Medical History, Treatment, and Condition**

Plaintiff was forty-eight years old on her alleged disability onset date and considered a younger individual for disability determination purposes, but on February 2, 2006 Plaintiff's age category for disability purposes changed to an individual approaching advanced age. (Tr. at 32; *see also* 20 CFR 404.1563 and 416.963) She was fifty-four years old when the ALJ rendered the decision that is now the subject of review. (Tr. at 34)

Plaintiff has at least a high-school education and is able to communicate in English. (*Id.* at 32) Plaintiff has past relevant work history as a tax preparer, mail carrier, and secretary. (*Id.*)

2

Plaintiff last worked in January 2003 as a part-time bookkeeper. (*Id.* at 32) Plaintiff's relevant medical history is detailed below.

### a. Knee Pain

On three occasions between September 29, 2003 and October 27, 2003, Cerro was treated by John Meccoro, a physician at Dr. DeShuttle's office, with complaints of bilateral knee pain, with the pain in her right knee being greater. (*Id.* at 326-30) On September 29, 2003, Cerro was diagnosed with bilateral patellofemoral syndrome. (*Id.* at 330) Cerro had full flexion and extension of the knee with a positive patellofemoral grinding test and a painful McMurray's test but a negative Drawer test. (*Id.*) On October 8, 2003, Cerro was again seen for complaints of pain to the right knee. (*Id.* at 328) Cerro retained full extension but had only 90 degree flexion and had mild swelling; X-rays were unremarkable and an MRI was ordered. (*Id.*) Dr. Meccoro recommended Cerro use crutches and refrain from driving and working until she could be re-evaluated. (*Id.*)

On December 22, 2003, Dr. Glenn Rowe reviewed the MRI from October 23, 2003 and determined that Cerro had a tear of the posterior horn of the medial meniscus of the right knee; he recommended surgery and an MRI of the left knee. (*Id.* at 381-82) The left knee MRI showed a horizontal tear of the posterior horn and mid-body of the medial meniscus. (*Id.* at 605)

On February 10, 2004, Cerro underwent a right knee arthroscopy, partial medial meniscectomy, chondroplasty of the patella, medial femoral condyle and medial tibial plateau. (*Id.* at 695-96) On July 8, 2004, Dr. Rowe postponed left knee surgery until the right knee was better. (*Id.* at 690) Between February and July 2004, Cerro was given four injections in her knee and ordered to go to physical therapy; however, she was unable to attend physical therapy for

3

insurance reasons. (*Id.* at 690) Cerro received right knee manipulation at Christiana Care Physical Therapy 25 times between September 28, 2004 and November 30, 2004. (*Id.* at 610)

### b.    Neck, head, and back pain

Cerro saw Dr. Rowe on October 19, 2004 with complaints of neck, head, and back pain. (*Id.* at 591) She was treated by a chiropractor, Dr. Gondolfo, 18 times between October 13, 2003 and September 27, 2004. (*Id.* at 1128-30) An MRI of the lumbar spine was performed on November 11, 2004, which showed multilevel disk desiccation and degenerative spondylosis. (*Id.* at 589-90) An MRI of the cervical spine on November 23, 2004 showed multilevel disc desiccation and degenerative spondylosis and bulges pressing upon the thecal sac at C5-6 and C6-7. (*Id.* at 586-87) A thoracic spine MRI was performed on February 3, 2005 due to continued complaints of pain. (*Id.* at 812) Cerro was treated at Christiana Care Physical Therapy 21 times between November 11, 2004 and February 10, 2005 for low back pain. (*Id.* at 766)

### c.    Fibromyalgia

Cerro saw a neurosurgeon, Dr. Koyfman, on September 29, 2004, for her complaints of neck, head, and back pain. (*Id.* at 662) Dr. Koyfman found that Cerro had diffuse degenerative cervical and lumbar spine disease and multiple areas of tenderness that suggested fibromyalgia. (*Id.* at 661-63) On December 3, 2004, Dr. Lloyd, a neurologist, examined Cerro and also felt she had fibromyalgia. (*Id.* at 638-40) Dr. Lloyd recommended follow-up with a rheumatologist. (*Id.* at 641)

Cerro began seeing Dr. Tamesis, a rheumatologist, on January 31, 2005. (*Id.* at 665-67) After reviewing her medical history and multiple studies and tests, Dr. Tamesis determined that Cerro could have fibromyalgia or inflammatory arthritis and referred her for pain management.

4

(*Id.*) Cerro saw Dr. Tamesis regularly in 2005 and 2006 for symptoms related to fibromyalgia. (*Id.* at 664, 796, 864, 857-62) Dr. Tamesis evaluated Cerro on March 8, 2005, noting that she met the criteria for fibromyalgia. (*Id.* at 797) Dr. Tamesis completed an Impairment Questionnaire for Fibromyalgia on March 14, 2007, and again noted Cerro met the criteria for fibromyalgia. (*Id.* at 875-77)

### d. Mental health and memory loss

Cerro's neurologist, Dr. Lloyd, referred her for neuropsychological testing on December 3, 2004, after seeing her for chronic migraine headaches. (*Id.* at 638, 640) On February 14, 2005, Cerro met with neuropsychologist Dr. Greenberg for this testing. (*Id.* at 657-60) Based on the battery of tests performed, Dr. Greenberg concluded that Cerro had Dysthymic Disorder; her Immediate Memory Index, a measure of her capacity to immediately recall visual or auditory information, was lower than 95% of people her age, but her General Memory Index was only lower than 77% of people her age. (*Id.* at 659, 660) Overall, Dr. Greenberg found Cerro to be a woman of above average intelligence whose memory test scores are below average, which may reflect difficulty learning, possibly related to depression and pain. (*Id.* at 660)

Dr. Hazlett, a psychologist, treated Cerro for memory loss in several counseling sessions beginning in March, 2007. (*Id.* at 1049-54) Cerro was diagnosed with bipolar disorder, ADHD with dementia like symptoms, and depression. (*Id.*)

### e. Visual impairments

Cerro saw Dr. Forgnoni, an optometrist, three times between October and December 2004. (Tr. at 643-44, 936-40) Dr. Forgnoni determined that Cerro has a visual disability and noted that any type of desk or computer work would be visually overwhelming and too

5

demanding for her. (*Id.* at 937)

Cerro continued seeing another optometrist, Dr. Blackburn, beginning in 2006, for complaints of skipping lines and losing place when reading, and poor comprehension. (*Id.* at 844) Dr. Blackburn examined Cerro and determined she had convergence insufficiency which could cause the ailments of which she was complaining. (*Id.* at 973-74)

## 2. The Remand Hearing

Plaintiff's first administrative hearing took place on March 18, 2005. (*Id.* at 267) Plaintiff testified and was represented by an attorney. (*Id.* at 267) A vocational expert also testified. (*Id.* at 303) The Appeals Council, in its remand order dated November 21, 2008, vacated the prior administrative hearing decision in its entirety because it was unable to take action upon the claimant's request for review, as the record upon which the ALJ based its decision could not be located. (*Id.* at 18) A new hearing was held on February 23, 2010 before a different ALJ ("Remand Hearing"). (*Id.*; *see also* Tr. at 1206)

### a. Plaintiff's Testimony

At the Remand Hearing, Plaintiff testified that she is fifty-four years old, five feet and two inches tall, and had weighed 220 pounds back in 2003. (*Id.* at 1223) She had been performing part-time bookkeeping work in 2001 and 2003 until she collapsed. (*Id.* at 1210)

Plaintiff testified that her most problematic physical ailments are neck, back, and knee pain. (*Id.* at 1211) Between September 29, 2003 and her fiftieth birthday, Cerro was experiencing severe, constant pain in her legs and back, preventing her from walking, standing, and sitting for more than ten minutes. (*Id.*) Plaintiff further testified that she could only walk a distance of 20 feet and that these conditions worsened after 2006. (*Id.* at 1212) She had to use a

6

cane to walk. (*Id.* at 1222) During this time, she saw numerous doctors, who treated her pain with needles, injections, and pills, treatments that helped to some degree. (*Id.* at 1214) Plaintiff testified that she was not sleeping for more than two hours at a time before waking for an hour and then falling back to sleep. (*Id.* at 1215)

Cerro also discussed having depression between 2003 and 2006, which included symptoms of forgetfulness, wanting to sleep all the time, and having a lack of desire to do anything. (*Id.* at 1219) She acknowledged having a short temper and being kicked out of doctors' offices due to her lack of patience. (*Id.*)

Plaintiff testified about having fibromyalgia, which contributes to pain throughout her body. (*Id.* at 1221) Plaintiff is taking Elavil, an antidepressant prescribed by her rheumatologist, to treat her nerve pain and also her depression. (*Id.* at 284)

Plaintiff explained that she experiences difficulty reading and concentrating. (*Id.* at 1218-19) She reported an inability to do simple math and write or read. (*Id.*) She also described vision problems that include missing words when reading or typing and having problems focusing. (*Id.*)

Plaintiff testified that her children prepare meals, clean, and do laundry and chores around the house. (*Id.* at 1215) She added that she cannot lift a jug of milk but she can flush the toilet. (*Id.* at 1227)

### b. Vocational Expert's Testimony

A vocational expert (VE) also testified at the Remand Hearing. (*Id.* at 1235) The VE classified Plaintiff's past work history as a bookkeeper as sedentary and skilled. (*Id.* at 1237) The ALJ put the following hypothetical to the vocational expert:

7

I'd like you to assume a person who's 46, with a high
school education, the work history just cited, has the
alleged onset date of September 29, 2003, suffering from
various right and left knee deficiencies, degenerative disk
disease, fibromyalgia diagnosed in '05, and depression . . .
and at the time in question some obesity. All of these
things cause her to have moderate pain, depression, and
knees, back, legs, and thighs and she saw doctors and took
medicine. If I find that she needed to have simple, routine,
unskilled jobs that require low concentration, low memory;
if I find she can lift ten pounds frequently, lesser amounts
frequently, sit for an hour, stand for five minutes
consistently eight hours a day, five days a week, would
have to avoid heights and hazardous machinery,
temperature and humidity extremes, jobs that require little
reading or writing ability or fine dexterity or fingering, but
would be able to do sedentary work activities, can you give
me jobs that such a person could do?

(*Id.* at 1237-40) In response, the vocational expert testified that such a person could hold a

position as a surveillance system monitor and a microfilm document scanner. (*Id.* at 1240)

When asked if that person could perform the past work that Cerro had done, the VE responded in

the negative. (*Id.* at 1241)

### 3. The ALJ's Findings

On March 23, 2010, the ALJ issued the following findings:

1.      The claimant meets the insured status requirements of the
Social Security Act through September 30, 2008.

2.      The claimant has not engaged in substantial gainful activity
since the alleged onset date (20 CFR 404.1571 et seq., and 416.971
et seq.).

3.      Since the alleged onset date of disability, September 29,
2003, the claimant has had the following severe impairments:
Fibromyalgia, degenerative disc disease, degenerative joint disease,
vision deficiency, obesity, and depression (20 CFR 404.152(c) and
416.920(c)).

8

4.      Since the alleged onset date of disability, September 29, 2003, the claimant has not had an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.      Since September 29, 2003, the claimant has had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a), with lifting 10 pounds occasionally and lesser amounts frequently, sitting for one hour and standing for five minutes consistently, on an alternate basis, eight hours per day, five days per week, must avoid heights and hazardous machinery, temperature and humidity extremes, and needs jobs that require little reading or writing, fine dexterity, or fingering. The claimant is further limited to simple, routine, unskilled jobs with an SVP level of 2 or less due to pain and depression.

6.      Since September 29, 2003, the claimant has been unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.      Prior to the established disability onset date, the claimant was a younger individual age 45-49. On February 2, 2006, the claimant's age category changed to an individual closely approaching advanced age (20 CFR 404.1564 and 416.963).

8.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.      Prior to February 2, 2006, transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled" whether or not the claimant has transferable job skills. Beginning on February 2, 2006, the claimant has not been able to transfer job skills to other occupations (See SSR 82-41 and 20 CRF Part 404, Subpart P, Appendix 2).

10.     Prior to February 2, 2006, the date the claimant's age category changed, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the

claimant could have performed (20 CFR 404.1569, 404.1569a and 416.969a).

11.     Beginning on February 2, 2006, the date claimant's age category changed, considering the claimant's age, education, work experience, and residual functional capacity, there are no jobs that exist in significant numbers in the national economy that the claimant could perform (20 CFR 404.1560(c), 404.1566, 416.960(c)and 416.966).

12.     The claimant was not disabled prior to February 2, 2006, but became disabled on that date and has continued to be disabled through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. at 20-33)

## III.     LEGAL STANDARDS

### A.     Motion for Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining the appropriateness of summary judgment, the Court must "review the record taken as a whole . . . draw[ing] all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (internal quotation marks omitted). If the Court is able to determine that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law, summary judgment is appropriate. *See Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005).

### B.     Review of the ALJ's Findings

The Court must uphold the Commissioner's factual decisions if they are supported by

"substantial evidence." *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *see also Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). "Substantial evidence" means less than a preponderance of the evidence but more than a mere scintilla of evidence. *See Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005). As the United States Supreme Court has noted, substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

In determining whether substantial evidence supports the Commissioner's findings, the Court may not undertake a *de novo* review of the Commissioner's decision and may not re-weigh the evidence of record. *See Monsour*, 806 F.2d at 1190-91. The Court's review is limited to the evidence that was actually presented to the ALJ. *See Matthews v. Apfel*, 239 F.3d 589, 593-95 (3d Cir. 2001). However, evidence that was not submitted to the ALJ can be considered by the Appeals Council or the District Court as a basis for remanding the matter to the Commissioner for further proceedings, pursuant to the sixth sentence of 42 U.S.C. § 405(g). *See Matthews*, 239 F.3d at 592. "Credibility determinations are the province of the ALJ and only should be disturbed on review if not supported by substantial evidence." *Gonzalez v. Astrue*, 537 F. Supp. 2d 644, 657 (D. Del. 2008) (internal quotation marks omitted).

The Third Circuit has explained that a "single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence, particularly certain types of evidence (e.g., that offered by treating physicians) – or if it really constitutes not evidence but mere conclusion." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir.

11

1983). Thus, the inquiry is not whether the Court would have made the same determination but, rather, whether the Commissioner's conclusion was reasonable. *See Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1983). Even if the reviewing Court would have decided the case differently, it must give deference to the ALJ and affirm the Commissioner's decision if it is supported by substantial evidence. *See Monsour*, 239 F.3d at 1190-91.

## IV.    DISCUSSION

### A.    Disability Determination Process

Title XVI of the Social Security Act provides for the payment of disability benefits to indigent persons under the SSI program. *See* 42 U.S.C. § 1382(a). A "disability" is defined for purposes of SSI as the inability "to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. *See* 42 U.S.C. § 1382c(a)(3). A claimant is disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(l)(B); *see also Barnhart v. Thomas*, 540 U.S. 20, 21-22 (2003).

In determining whether a person is disabled, the Commissioner is required to perform a five-step sequential analysis. *See* 20 CFR § 416.920; *Russo v. Astrue*, 421 Fed. App'x. 184, 188 (3d Cir. Apr. 6, 2011). If a finding of disability or non-disability can be made at any point in the sequential process, the Commissioner will not review the claim further. *See* 20 CFR § 416.920(a)(4).

At step one, the Commissioner must determine whether the claimant is engaged in any substantial gainful activity. *See* 20 CFR § 416.920(a)(4)(I) (mandating finding of non-disability when claimant is engaged in substantial gainful activity). If the claimant is not engaged in substantial gainful activity, step two requires the Commissioner to determine whether the claimant is suffering from a severe impairment or a combination of impairments that is severe. *See* 20 CFR § 416.920(a)(4)(ii) (mandating finding of non-disability when claimant's impairments are not severe). If the claimant's impairments are severe, the Commissioner, at step three, compares the claimant's impairments to a list of impairments that are presumed severe enough to preclude any gainful work. *See* 20 CFR § 416.920(a)(4)(iii). When a claimant's impairment or its equivalent matches an impairment in the listing, the claimant is presumed disabled. *See* 20 CFR § 416.920(a)(4)(iii). If a claimant's impairment, either singly or in combination, fails to meet or medically equal any listing, the analysis continues to steps four and five. *See* 20 CFR § 416.920(e).

At step four, the Commissioner determines whether the claimant retains the residual functional capacity ("RFC") to perform her past relevant work. *See* 20 CFR § 416.920(a)(4)(iv) (stating claimant is not disabled if able to return to past relevant work). A claimant's RFC is "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Fargnoli v. Massanari*, 247 F.3d 34, 40 (3d Cir. 2001). "The claimant bears the burden of demonstrating an inability to return to her past relevant work." *Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999) (internal citation omitted). If the claimant is unable to return to her past relevant work, step five requires the Commissioner to determine whether the claimant's impairments preclude her from adjusting to any other available work. *See*

13

20 CFR § 416.920(a)(4)(v) (mandating finding of non-disability when claimant can adjust to other work); *Plummer*, 186 F.3d at 428. At this last step, the burden is on the Commissioner to show that the claimant is capable of performing other available work before denying disability benefits. *Id.* at 428. In other words, the Commissioner must prove that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with [her] medical impairments, age, education, past work experience, and [RFC]." *Id.* In making this determination, the ALJ must analyze the cumulative effect of all of the claimant's impairments. *See id.* At this step, the ALJ often seeks the assistance of a vocational expert. *See id.*

## B.  Cerro's Argument on Appeal

As Defendant explains, Cerro is "essentially claiming that from September 2003 [her alleged disability onset date] through February 2006 [when she turned 50, and the date from which she is receiving disability benefits], she was unable to sit and get paid to observe a monitor." (D.I. 23 at 11) The Court agrees with Defendant that substantial evidence supports the ALJ's findings leading to the conclusion that Cerro was not disabled prior to February 2006.

Cerro presents four specific arguments in her appeal: (1) the ALJ failed to follow the treating physician rule; (2) the ALJ failed to evaluate Cerro's pain and the medical evidence related to it; (3) the ALJ failed to properly determine the onset date of Cerro's disability; and (4) the ALJ erred when determining her RFC. Although Defendant failed to address Cerro's specific arguments in her brief, the Court below considers each of these arguments in turn. None of them alter the Court's overall conclusion that substantial evidence supports the ALJ's determination.

14

## 1. The treating physician rule

Cerro argues that the ALJ failed to give controlling weight to her treating physicians, in violation of the treating physician rule. Specifically, Cerro points to the evidence provided by her treating physicians Dr. Tamesis, Dr. Forgnoni, Dr. Greenberg, and Dr. Lloyd. (D.I. 20 at 13-14) Relatedly, Cerro argues that the opinions of Drs. Lloyd, Forgnoni, and Greenberg are not discussed by the ALJ and that these omissions constitute reversible error. (D.I. 20 at 14) Further, Cerro argues that the ALJ, in discussing Dr. Tamesis's opinion, relies solely on opinions that were given after February 2, 2006. (D.I. 20 at 14) Cerro argues that the ALJ improperly gives controlling weight to Dr. Keyes, a psychologist who saw Cerro two times in 2007 and 2009, and that Dr. Keyes's opinions are improperly used to rebut the testimony of a rheumatologist, a chiropractor, and two optometrists. (D.I. 20 at 14)

Defendant responds that the ALJ's opinion – that Cerro retained the ability to perform a sedentary job prior to February 2, 2006 – is supported by substantial evidence. (D.I. 23 at 11)

The Third Circuit subscribes to the "treating physician doctrine." *Mason v. Shalala*, 994 F.2d 1058, 1067 (3d Cir. 1993). Consistent with this rule, a treating physician's opinion is accorded "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and it is not inconsistent with the other substantial evidence in the record." *Fargnoli*, 247 F.3d at 43. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir. 1994). A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports "great weight, especially when their opinions reflect expert judgment based on a continuing

15

observation of the patient's condition over a prolonged period of time." *Plummer*, 186 F.3d at 429 (internal citation omitted). When there is medical evidence contradicting the treating physician's view, and an ALJ decides to give controlling weight to the views of another physician, the ALJ must carefully evaluate how much weight to accord the treating physician. *See Gonzalez*, 537 F. Supp. 2d at 660. A decision not to give the treating physician controlling weight does not automatically result in giving no weight whatsoever to that opinion. *See id.* In evaluating medical opinions, an ALJ must weigh all the evidence and resolve all material conflicts. *See Barnhill v. Astrue*, 794 F. Supp. 2d 503, 515 (D. Del. 2011). Additionally, it is not for this Court to re-weigh the various medical opinions in the record. *See Gonzalez*, 537 F. Supp. 2d at 659.

If a treating physician's opinion is not given controlling weight, the ALJ should consider numerous factors in determining the weight to give it, including: length of treatment relationship, frequency of examination, nature and extent of the treatment relationship, supportability of the opinion afforded by relevant medical evidence, consistency of the opinion with the record as a whole, and specialization of the treating physician. *See* 20 CFR § 416.1527(d)(3)-(5). Further, when an ALJ's decision is to deny benefits, the notice of the determination must: contain specific reasons for the weight given to the treating source's medical opinion, supported by substantial evidence in the case record and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave the treating source's medical opinion and the reasons for that weight. SSR 96-2p.

Here, the ALJ gave declined to give controlling weight to the opinions of treating physician Dr. Tamesis. (Tr. at 29) The ALJ found Dr. Tamesis's opinion to be unsupported by

medical signs and laboratory findings, and inconsistent with his detailed treatment records, which the ALJ found did not document neurological abnormalities or a loss of range of motion in any of Cerro's joints. (*Id.* at 30) The ALJ found Dr. Tamesis's opinions to be inconsistent with the record as a whole. (*Id.*) Hence, the ALJ fulfilled his obligation to explain why he was not giving controlling weight to the opinion of Dr. Tamesis.

Cerro argues that she has fibromyalgia, that Dr. Tamesis determined that she had it, and that other doctors agreed with Dr. Tamesis's assessment. (D.I. 20 at 15-16) This contention does not help Cerro's appeal since the ALJ already found that Cerro did have fibromyalgia. (Tr. at 20) Further, even if Dr. Tamesis's opinions had been given controlling weight they would not support Plaintiff's contention that Cerro became disabled on September 29, 2003, because Dr. Tamesis only began treating Cerro in January 2005. (*Id.* at 665-67)

There is no indication that the ALJ's approach to Dr. Tamesis's opinions was limited to the time period after February 2, 2006, as Cerro alleges. The ALJ discusses at length Dr. Tamesis's evaluation of Cerro on January 31, 2005, February 18, 2005, and March 8, 2005. (*Id.* at 21, 28)

Turning to the other treating physicians, Cerro argues that the ALJ declined to give any significant weight to Dr. Gandolfo's opinion, as the ALJ found it inconsistent with the residual functional capacity performed on February 10, 2005, and unsupported by Dr. Gandolfo's and other's treatment records in the exhibit file, which show no neurological abnormalities, no loss of motion, no motor or sensory loss, and improvement with medical treatments. (*Id.* at 30) The ALJ found Dr. Gandolfo's opinion – that Cerro's pain and medications would severely affect her ability to concentrate and complete a normal workday – is inconsistent with Dr. Keyes's detailed

17

consultative mental examination findings, which show only moderate deficits in concentration and memory. (*Id.*)

The ALJ gave limited weight to Dr. Blackburn's opinions regarding Cerro's pain, finding these opinions were outside of Dr. Blackburn's expertise as an optometrist and further that the opinions were unsupported by the record. (*Id.* at 30-31) Further, the ALJ noted that Dr. Blackburn completed the form evaluating Cerro on February 16, 2008, yet the date of his last examination of her was December 6, 2005. (*Id.* at 31)

The opinions of non-treating physicians must be examined for whether, and how well, these opinions take into account other evidence in the record, including the view of treating physicians. *See* 20 CFR § 416.927(c)(3). "[B]ecause nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions. We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources." (*Id.*)

The ALJ gave significant weight to non-treating physician Dr. Keyes's opinion, finding his opinion supported by medically acceptable clinical and laboratory findings and further finding it consistent with the RFC and the record when viewed in its entirety. (Tr. at 31) The ALJ could rely on Dr. Keyes's opinion because Dr. Keyes examined Cerro and Dr. Keyes's opinion was based on familiarity with the Social Security Rules and Regulations.

The ALJ accepted Dr. Elliot's opinion regarding Cerro's visual abilities, finding his opinion was based on Cerro's own admissions as well as Dr. Elliot's clinical examination findings. (*Id.*) The record also contains RFC assessments by state agency medical consultants,

18

Dr. Vinod Kataria in January 2004 (*id.* at 390-97) and Dr. John DeCarli in July 2004 (*id.* at 404-06; *see also id.* at 414-15), which further support the ALJ's RFC determination. Notwithstanding the ALJ's silence with respect to the opinions of Drs. Lloyd, Forgnoni, and Greenberg, as well as the ALJ's failure to mention Drs. Rowe, DuShuttle, and Koyfman – and even considering Defendant's unhelpful failure to address Cerro's specific arguments regarding application of the treating physician rule – given the substantial evidence supporting the ALJ's determinations, the Court concludes that neither an award of benefits (from September 2003 to February 2006) nor a remand is warranted. It is not for the Court to re-weigh the medical evidence. Accordingly, the Court will grant Defendant's motion for summary judgment and deny Plaintiff's motion.

## 2. Cerro's credibility

Cerro argues that the ALJ failed to evaluate her credibility properly and, as a result, failed to properly evaluate her pain and the medical evidence related to it. (D.I. 20 at 17) An ALJ must follow a two-step process in evaluating a claimant's credibility. First, the ALJ must "consider whether there is an underlying medically determinable physical or mental impairment(s) . . . that could reasonably be expected to produce the individual's pain or other symptoms." SSR 96-7p, 1996 WL 374186 (July 2, 1996). Second, the ALJ "must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities." *Id.* At this second prong, an ALJ considers: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any

19

medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. *See id.*

Regulations instruct the ALJ to evaluate the consistency of a claimant's statements with the evidence of record. *See* 20 CFR § 416.929(c)(4) ("We will consider whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between your statements and the rest of the evidence, including your history, the signs and laboratory findings, and statements by your treating or nontreating source or other persons about how your symptoms affect you.").

Here, the ALJ properly considered the factors identified above and found that the medical complaints Cerro has could reasonably be expected to cause the alleged symptoms about which she testified at the Remand Hearing. However, the ALJ also found that Cerro's claims concerning the intensity, persistence, and limiting effects of these symptoms are not consistent with the residual functional capacity assessment. (Tr. at 27) Specifically, the ALJ noted that a sleep study showed no evidence of sleep apnea or need for a CPAP despite Cerro's repeated complaints of poor sleep. (*Id.*) Regarding Cerro's visual deficiencies, Dr. Blackburn recommended Cerro be re-evaluated by a neuropsychologist and attend visual therapy, but Cerro declined to do both and the record shows Cerro went for three years without treatment for her visual complaints. (*Id.*) For these and other reasons discussed by the ALJ (*see* Tr. at 23-31), the

20

Court concludes there is substantial evidence to support the ALJ's assessment of Cerro's credibility, and the Court will not supplant this assessment.

### 3. Cerro's onset date of disability

Plaintiff alleges that the ALJ does not explain why Cerro's eligibility for disability changed after she reached age 50 and that the ALJ failed to determine when Cerro's disability began. (D.I. 20 at 19) Cerro argues that she became disabled beginning on September 29, 2003, more than two years prior to the February 2, 2006 date from which the ALJ awarded her benefits. (*Id.*) Plaintiff cites SSR 83-20, which provides that "the established onset date must be fixed based on the facts" and that a "convincing rationale must be given for the date selected."

Although the ALJ did not expressly mention SSR 83-20, the ALJ acted in accordance with it, determining that Cerro's eligibility for disability changed when she turned 50 as a result of her age category changing. (Tr. at 33) Substantial evidence supports the ALJ's application of Medical-Vocational Rule 201.14 to find that Cerro became disabled on the date her age category changed, February 2, 2006. (*See generally* D.I. 23 at 1 n.2) (Defendant stating that "[w]hen Plaintiff reached the age of 50, the Medical-Vocational Guidelines *directed* a conclusion that she was disabled") (emphasis added)

### 4. The RFC determination

Finally, Cerro argues that the Residual Functional Capacity ("RFC") determined by the ALJ for the period prior to February 2, 2006 was improper as it did not account for all of Plaintiff's limitations and symptoms. Alternatively, even the RFC determined by the ALJ would preclude all sedentary employment.

The ALJ found that since September 29, 2003, Cerro has had the residual functional

21

capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a), with lifting 10 pounds occasionally and lesser amounts frequently, sitting for one hour and standing for five minutes consistently, on an alternate basis, eight hours per day, five days per week, must avoid heights and hazardous machinery, temperature and humidity extremes, and needs jobs that require little reading or writing, fine dexterity, or fingering. The ALJ further determined that Cerro was limited to simple, routine, unskilled jobs with an SVP level of 2 or less due to pain and depression.

The ALJ provided detailed explanation for his RFC determination, including discussion of his reliance on or rejection of medical opinions. (Tr. at 26-31) Substantial evidence supports the ALJ's RFC determination.

## V.    CONCLUSION

For the reasons given above, the Court will grant Defendant's motion for summary judgment and deny Plaintiff's motion for summary judgment. An appropriate order follows.